# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
June 10, 2015 Session

## STATE OF TENNESSEE v. CORTNEY R. LOGAN

**Appeal from the Criminal Court for Davidson County**
**No. 2009-C-2822      Seth Norman, Judge**

---

**No. M2014-01687-CCA-R3-CD – Filed October 8, 2015**

---

The Defendant-Appellant, Cortney R. Logan, and his co-defendant, Joseph Leon Jackson, Jr., were indicted by the Davidson County Grand Jury for attempted first degree premeditated murder in count 1 and employment of a firearm during the flight or escape from the attempt to commit a dangerous felony in count 3. Although Logan was not charged in count 2 of the indictment, Jackson was charged in count 2 with employing a firearm during the attempt to commit a dangerous felony. Following a jury trial, Logan was convicted as charged, and the trial court imposed mandatory consecutive sentences of twenty-five years for the attempted first degree murder conviction and six years for the employment of a firearm during the flight or escape conviction. On appeal, Logan argues: (1) the trial court erred in allowing the State to present proof of his role in Jackson's escape from custody in Mississippi to show Logan's motive and intent to commit the offenses in Tennessee under a theory of criminal responsibility; (2) the evidence is insufficient to sustain his convictions; and (3) his effective sentence of thirty-one years is excessive. Upon review, we affirm Logan's convictions but remand the case for entry of a corrected judgment showing a conviction for employment of a firearm during the flight or escape from the attempt to commit a dangerous felony in count 3 and either redacting the word "Violent" and leaving the 100% release eligibility designation or using the "Special Conditions" section of the judgment form to specify that Logan received a sentence of six years at one hundred percent release eligibility for his conviction under Code section 39-17-1324(b)(4). In all other respects, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgment**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Manuel B. Russ, Nashville, Tennessee, for the Defendant-Appellant, Cortney R. Logan.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. Johnson, III, District Attorney General; and John C. Zimmermann, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Trial.** Sergeant Mark Chestnut, an officer with the Metropolitan Nashville Police Department for the last twenty-four years, testified that his career ended the day he initiated a traffic stop of Logan and was shot five times by Jackson, the co-defendant passenger. On June 25, 2009, he stopped a rental car with a Georgia tag driven by Logan because Logan was not wearing his seat belt. The stop occurred on Interstate 40 near the Bellevue area just outside of Nashville. Sergeant Chestnut approached the car on the passenger's side and asked Logan for his driver's license and either the registration papers or the rental documents for the car. Logan provided his license and confirmed that the car was a rental car but was unable to locate the rental papers for the vehicle. While Sergeant Chestnut was talking to Logan, he observed another person sitting in the back seat of Logan's vehicle. Because Sergeant Chestnut "thought it was unusual" that a person was sitting in the back seat when the front passenger seat was empty, he asked Logan to step out of his vehicle. He then asked Logan about the car he was driving, where he was coming from, and where he was going. Logan replied that he had rented the car from the airport in Louisville, Kentucky, although he could not recall the rental company. Logan claimed he was coming from Nashville, but he gestured that he had come from a different direction. Logan also said he was going to a small community in north Nashville known as Dodge City.

Sergeant Chestnut noticed that Logan hesitated before answering nearly all of his questions. Logan continued to provide evasive responses when he was asked about his employment. After talking with Logan, Sergeant Chestnut spoke to the other occupant of the car. Although Logan had said that his passenger's name was "James Gibbs," the passenger told Sergeant Chestnut that his name was Joseph Jackson. The passenger was unable to provide any identification. When Sergeant Chestnut observed one or two sets of handcuffs on the floorboard of the car beneath Jackson's feet, he asked Jackson about them but did not recall his answer. He also asked Jackson where they had been, and Jackson replied, "Louisiana." He noted that Jackson's responses to his questions differed from the responses given by Logan.

After talking with Jackson, Sergeant Chestnut walked back to Logan. He asked that Logan stand on the shoulder, near the right front bumper of his patrol car, while Jackson remained in the back seat of the rental car. Sergeant Chestnut then returned to

his patrol car and called for backup. Although he felt Logan and Jackson were involved in "some serious criminal activity," he did not indicate this to the suspects. Sergeant Chestnut called the Blue Lighting Operation Center (BLOC) to get national record checks for Logan and Jackson, and while he was on the phone, Jackson exited the rental car and walked to the front passenger window of his patrol car. When Sergeant Chestnut rolled down the window, Jackson gave him a telephone number for his father, so that his father could verify his identity, before returning to the rental car. A few moments later, while Sergeant Chestnut was still on the phone with BLOC, he saw that Jackson had returned and was standing near the front bumper of his patrol car.

Sergeant Chestnut stated that Jackson approached and said "something normal[.]" He then pulled the gun from his waistband and pointed at him, shooting him four times. During the shooting, Logan was standing twelve or thirteen feet away from Jackson. After he was shot, Sergeant Chestnut "saw Mr. Jackson coming back toward [him]." He thought, "[Jackson's] coming back to kill me or make sure I'm dead." Sergeant Chestnut was able to reverse his car away from Jackson and Logan, and observed them run back toward their car and take off. Logan was driving when he and Jackson left the scene. As soon as Sergeant Chestnut put his car in reverse, he relayed a message on his radio stating that he had been shot, providing his location, and giving a description of the two suspects and their vehicle.

Sergeant Chestnut identified Jackson from a photograph entered into evidence and stated that Jackson was wearing the same clothes in the photograph as the ones he was wearing the day he was shot. He also identified Logan from another photograph and observed that Logan was also wearing the same clothes in the photograph as the ones he had on the day of the shooting. In addition, he identified a photograph of the inside of his police car, which showed a silver revolver in the area between the front passenger seat and the door. He confirmed that this revolver did not belong to him and that he had been shot with "a silver revolver."

At this point during Sergeant Chestnut's testimony, the jury was excused, and the trial court conducted a Rule 404(b) hearing in which four Mississippi witnesses and Detective Norris Tarkington testified. At the conclusion of this hearing, the trial court took the matter under advisement.

The jury was brought back into the courtroom, and Sergeant Chestnut continued his testimony in the presence of the jury. The State played a video/audio recording of the traffic stop taken from equipment inside Sergeant Chestnut's patrol car. The recording contained video and audio of the conversations Sergeant Chestnut had with Logan and Jackson, although the audio portions of these conversations were difficult to hear because

-3-

of road noise.  Sergeant Chestnut returned to his patrol car, shut his door, and turned off the audio portion of the recording in order to make phone calls to another officer and to BLOC.  During this time period, the recording showed Jackson leaning out of the rental car, apparently communicating with Logan.  A moment later, Jackson exited the rental car, raised his hands, and motioned for permission to approach before walking up to the passenger side of Sergeant's Chestnut's patrol car.  Although there was no sound for this portion of the recording, it showed Jackson returning to the rental car and getting in, even though his door remained open.  The recording then depicted Jackson exiting the rental car a second time, again raising his hands, and approaching the passenger side of Sergeant Chestnut's patrol car.  The recording did not have audio at this point and did not show Jackson shooting Sergeant Chestnut inside his patrol car, although this is the time period when the shooting occurred.  As Jackson returned to the passenger side of the rental car, Logan turned and smiled at Sergeant Chestnut before quickly getting into the driver's seat of the rental car.  Jackson began walking toward Sergeant Chestnut's patrol car a third time and then turned and ran to the rental car and climbed inside.  Sergeant Chestnut placed his car in reverse as Logan and Jackson drove away.

Sergeant Chestnut acknowledged that when he activated his blue lights to initiate the traffic stop, Logan immediately stopped his vehicle.  He said he did not observe any contraband on Logan's person and did not believe that Logan was armed when he exited his vehicle.  Sergeant Chestnut admitted that Logan did not move from the location where he told him to stand until after Jackson shot him.  He said Logan never tried to distract him and never approached his car window to try to talk to him.  Sergeant Chestnut never observed Logan talking to Jackson during the traffic stop.

William Morgan, an officer with Interdiction unit of the Metropolitan Nashville Police Department, testified that he was working on June 25, 2009, and drove past Sergeant Chestnut's stop of Logan and Jackson in order to stop a different vehicle.  Moments later, Sergeant Chestnut requested that Officer Morgan return to the location of his stop for backup, and Officer Morgan headed in Sergeant Chestnut's direction.  As Officer Morgan was waiting for a red light, Sergeant Chestnut contacted him a second time, informing him that he had been shot.  Officer Morgan was the first officer to arrive at the scene after the shooting.  Sergeant Chestnut told him "that the car that he stopped had a Georgia tag" and that "he had been shot four times with a revolver, a silver handgun."  As Sergeant Chestnut was being treated and removed from his patrol car, Officer Morgan found Logan's driver's license.  He later replayed the recording of the stop, got the tag number for Logan's rental car, and relayed this information over the radio.

Matthew Dixon, a detective with the Specialized Investigation Division of the Metropolitan Nashville Police Department, testified that his supervisor, Sergeant Duncan, informed him that Sergeant Chestnut had been shot and gave him a description of Logan's rental car. As Detective Dixon drove to the area where the shooting occurred, he noticed a car matching the description of the suspects' vehicle. Detective Dixon confirmed that the license tag of this vehicle matched the tag of the car involved in the shooting. Shortly thereafter, Detective Dixon and Sergeant Duncan blocked Logan's car. When Logan's vehicle stopped, more than ten police officers were present when Logan and Jackson exited the car and were taken into custody. After Logan exited the driver's side of the rental car, Detective Dixon recalled seeing two ammunition magazines and a pair of gloves lying on the ground just outside the driver's side of the vehicle. He said one of the officers had removed these two magazines from Logan's person. Detective Dixon acknowledged that Logan did not resist arrest or assault any officers as he was taken into custody.

William Kirby, an officer with the Crime Scene section of the Metropolitan Nashville Police Department, testified that he processed the scene where Logan's car was stopped by Sergeant Duncan and Detective Dixon. Officers found a loaded FEG semi-automatic pistol on top of the center console of Logan's car, several zip ties, and a holster for this pistol in a green duffle bag in the backseat of the car. They also found a set of leg shackles and handcuffs on the floorboard of the vehicle's backseat. The keys to these shackles and handcuffs were found inside the car. In addition, officers found a receipt for shoes that were purchased at Foot Action in Louisville, Kentucky, on June 24, 2009, as well as a Walgreens receipt for the same date inside the car.

At the conclusion of Officer Kirby's testimony, the jury was excused, and the trial court ruled that the evidence of the offenses and acts committed by Logan in Mississippi would be admitted because "the probative value of the proof outweighs the prejudicial value towards motive and intent[.]"

Norris Tarkington, a detective with the Metropolitan Nashville Police Department, testified that he investigated Sergeant Chestnut's shooting. He described the accident scene when he arrived and observed "a handgun wedged between the seat and where the door would have been closed." Detective Tarkington identified a photograph showing that the handgun, a silver revolver, had six shell casings inside the cylinder. He said only five of the six bullets had fired because one had misfired. Of the five bullets that fired, two bullets entered Sergeant Chestnut's body, two were stopped by his protective vest, and one of the bullets went through the driver's side door. One of the bullets recovered from Sergeant Chestnut's body and the two bullets recovered from his vest were sent to

-5-

the Tennessee Bureau of Investigation crime laboratory for analysis, and testing showed that all three bullets were fired from the same handgun, a Model 64 .38 revolver.

Detective Tarkington's investigation revealed that Logan and Jackson had originally come from Greenwood, Mississippi, where Jackson had escaped from custody of the CCA Delta Correctional Institution. He said that Jackson was able to escape during an eye examination at an optometrist's office in Greenwood at 8:00 a.m. on June 25, 2009, and that Sergeant Chestnut had stopped Logan and Jackson just outside of Nashville at 12:55 p.m. that day. The distance between Greenwood, Mississippi, and the location of the traffic stop in Tennessee was 324.17 miles, and the travel time for this trip was five hours and eight minutes. Following the incident, Detective Tarkington travelled to the Greenwood optometrist's office, where employees Margaret Davis and Ashley Bowlin identified Logan from a photographic lineup as the man who helped Jackson escape. Detective Tarkington also interviewed Sergeant Perry Jones and Sergeant Chrissy Flowers, two correctional officers present during the escape, who also identified Logan from a photographic lineup as the man who helped Jackson escape. Detective Tarkington learned that the silver revolver used to shoot Sergeant Chestnut had been stolen from one of the correctional officers during the escape. He also recovered a cellular telephone during his investigation and learned that Logan and Jackson had been communicating through text messages and phone calls during Jackson's incarceration, even though Jackson was not allowed to possess or use a cellular phone.

Detective Tarkington also discovered that the rental car driven by Logan the day of the shooting had been rented by Logan's mother on the afternoon of June 24, 2009. The receipt found inside Logan's car showed that a new pair of shoes had been purchased on June 24, 2009, and officers determined that Jackson was wearing a new pair of shoes when he was taken into custody. In addition, the Walgreens receipt found in Logan's car showed that a card for cell phone minutes had been purchased for a temporary cellular phone.

Sergeant Chrissy Flowers, a corrections officer at the Delta Correctional Facility in Greenwood, Mississippi, testified that she transported Jackson for his eye examination at the optometrist's office on June 25, 2009, at 8:00 a.m. Although two other correctional officers were present, Sergeant Flowers was the only officer armed, and she carried a .38 caliber revolver with a six-round capacity. Just after they arrived, Logan stepped inside the office. Logan carried a green duffle bag on his arm and fired his first shot into the ceiling as he screamed for everyone to get on the ground. At the time, Sergeant Lee Robertson was with Jackson and a nurse in the first examination room. A second nurse was sitting behind the desk, and Sergeant Flowers and Sergeant Jones were sitting in the waiting room. Logan continued to scream and curse and demanded "the keys." He stood

over Sergeant Flowers and threatened to shoot her in the head if she did not give him the keys. When Logan held his gun to her head, Sergeant Flowers begged him not to kill her. She said Logan's gun was a black nine millimeter. Initially, Sergeant Flowers and the other two correctional officers believed that Logan was there to rob the optometrist's office. They later realized that Logan wanted the keys to unlock Jackson's handcuffs and leg shackles, and Sergeant Robertson threw the keys over the counter. Logan then ordered Sergeant Flowers to uncuff Jackson. Although she was able to uncuff Jackson on one side, she had difficulty releasing the other side. Jackson eventually got the keys from her to uncuff himself. When Jackson saw Sergeant Flowers trying to use her cellular phone to dial 9-1-1, he took it from her.

Sergeant Flowers said that when Logan walked around to tell her he was going to shoot her in the head, he saw that she had a gun. Logan began screaming at her to give him the gun, and as she went for the gun, he screamed at her to let him see her hands. She begged Logan to calm down, and Logan unsnapped her holster and removed her revolver, which had been issued to her by the Delta Correctional Institution. She said that at some point, Logan fired a second shot into the ceiling, and Jackson attempted to calm Logan because he was "screaming" and "jumping around." Sergeant Flowers said Jackson changed into clothes from the green duffle bag Logan had brought with him. Once Logan and Jackson left the office, Sergeant Jones called 9-1-1.

Sergeant Flowers identified Logan at trial and from a photographic lineup as the man who fired a shot into the air and put his gun to her head. She also identified Jackson from a photographic lineup as the inmate who escaped on June 25, 2009. Finally, she identified the silver revolver found in Sergeant Chestnut's vehicle as the weapon given to her by the Delta Correctional Facility.

Sergeant Perry Jones, another corrections officer at the Delta Correctional Institute, testified that he escorted Jackson and another inmate to the optometrist's office in Greenwood. He said both inmates were restrained with handcuffs, a waist belly chain, hands secured to the waist, and leg irons. Sergeant Jones said the prison policy for off-site excursions was that the inmates were not informed that they were going anywhere and were simply placed in the van. He acknowledged that there were some employees who knew when an inmate was scheduled to be taken off-site.

Sergeant Jones stated that on June 25, 2009, they arrived at the optometrist's office a few minutes before it opened. When the office employees arrived, Sergeant Jones and the other officers unloaded Jackson and the other inmate and walked with them through the back door of the clinic. Jackson was escorted to an examination room by Sergeant Robertson, another officer. The other inmate was placed in a chair. Sergeant

-7-

Jones sat on a bench in the middle of the office to observe what was happening, and Sergeant Flowers was seated near the entry door. Almost immediately after they walked inside, Logan entered the clinic. Sergeant Jones identified Logan at trial as the man who entered the optometrist's office. Logan immediately fired a shot into the ceiling and told everyone to get on the floor. Sergeant Jones described Logan's gun as a "silver semi-automatic handgun." Logan demanded the keys, and the officers eventually realized that Logan wanted the keys to unlock Jackson's handcuffs and leg shackles. Logan pointed his gun at Sergeant Flowers's head and removed her gun from its holster.

At that point, one of the nurses ran to the back of the office, and Logan told them that if the nurse did not come back, he was going to "blow [Sergeant Flowers's] head off." Sergeant Robertson, who had been in the back, retrieved the keys and threw them onto the floor. Logan told Sergeant Flowers to remove Jackson's cuffs, and when she was unable to remove all of them, Jackson took the keys and removed them himself before changing into clothes from Logan's duffle bag. Logan fired a second shot inside the clinic, and Jackson told Logan to calm down because he was screaming. After changing clothes, Logan left the building, and Jackson followed him outside. Sergeant Jones said that when Detective Tarkington showed him a photographic lineup approximately two weeks after the incident, he identified Logan as the man who helped Jackson escape.

Ashley Bowlin, an employee at the optometrist's office, testified that she was present when Jackson escaped from the clinic on June 25, 2009. Shortly after the officers and inmates entered the office, Logan entered the office through the back door. When Bowlin asked if she could help him, Logan raised a gun with his right hand, fired a shot, and told everyone to get on the floor. Bowlin slid into her boss's office, and shut the door. Logan began screaming at her to open the door, and when she finally opened it, Logan put his gun in her face and told her he would "blow [her] f[------] head off." Logan returned a short time later, placed the gun in Bowlin's face again, and told her to get off the phone. Bowlin replied that she was not on the phone because there was no phone in that office. A short time later, Bowlin heard a second gunshot and was unsure whether anyone had been injured. Finally, she heard Sergeant Jones ask if everyone was okay. Bowlin said she was unable to get a good look at Logan because she was "staring down the barrel of a gun at the time."

Margaret Davis, another employee at the optometrist's office, stated that she was also present during the incident on June 25, 2009. When she arrived at work, she heard something that sounded like a gunshot. As she approached to the door, Logan threw it open, put a small silver semi-automatic handgun in her face, and told her to "[g]et in the building, B[----]." Logan screamed at her to get on the floor, and she complied. She saw

that two correctional officers were also lying on the floor. Davis observed Logan pacing and yelling and saw Jackson changing his clothes with handcuffs dangling from one wrist. When Logan began screaming about the location of the other employee, Jackson told Logan to calm down and to leave the building. Logan exited the clinic, and Jackson followed him. Approximately two weeks after the June 25, 2009 incident, Davis identified Logan from a photographic lineup presented by Detective Tarkington. She also identified Logan at trial as the man who put the gun in her face. Davis said she had "no doubt at all" and was "positive" about her identification of Logan.

## ANALYSIS

**I. Evidence of Logan's Involvement in Jackson's Escape.** Logan argues that the trial court erred in allowing the State to present proof of his involvement in Jackson's escape from custody in Mississippi, which occurred a few hours prior to the charged offenses in Tennessee. He claims this evidence should not have been admitted under Tennessee Rules of Evidence 403 or 404. We conclude that the trial court properly admitted this proof under Rule 404(b).

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)).

The rules of evidence determine the admissibility of each piece of evidence. Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Evidence of a defendant's character offered for the purpose of proving that he or

she acted in conformity with that character is inadmissible. <u>See</u> Tenn. R. Evid. 404(a). However, evidence of other crimes, wrongs, or bad acts may be admissible for other purposes if this evidence satisfies the conditions in Rule 404(b).

> Rule 404(b) states:
>
> **Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Pursuant to the Advisory Commission Comment to Rule 404, "evidence of other crimes should usually be excluded." Tenn. R. Evid 404(b), Adv. Comm'n Cmt. However, in exceptional cases, "where another crime is arguably relevant to an issue other than the accused's character," such as "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake," the evidence may be admissible. <u>Id.</u>; <u>see</u> <u>State v. Berry</u>, 141 S.W.3d 549, 582 (Tenn. 2004) (stating that evidence of other crimes, wrongs, or acts may be admissible if it establishes the defendant's motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation).

"Rule 404 was patterned in great measure on <u>State v. Parton</u>, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible." <u>State v. McCary</u>, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Rule 404 "establish[es] that character evidence cannot be used to prove that a person has a propensity to commit a crime." <u>Id.</u> (citing Tenn. R. Evid. 404(b); <u>State v. Adkisson</u>, 899 S.W.2d 626, 645 (Tenn. Crim. App. 1994)). Trial courts have been encouraged to take a

"'restrictive approach' to 404(b) evidence because such proof 'carries a significant potential for unfairly influencing a jury.'" State v. Jackson, 444 S.W.3d 554, 601 (Tenn. 2014) (quoting State v. Dotson, 254 S.W.3d 378, 387 (Tenn. 2008)). "'[T]he risk that a jury will convict for crimes other than those charged–or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect that outweighs ordinary relevance.'" Id. (quoting State v. Sexton, 368 S.W.3d 371, 403 (Tenn. 2012)). The more similar the conduct or act to the crime for which the defendant is on trial, the greater the potential for a prejudicial result. State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994); McCary, 119 S.W.3d at 243 (citing State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995)).

If a trial court does not substantially comply with the procedural requirements of Rule 404(b), then this court will review the trial court's admissibility ruling de novo. State v. Clark, 452 S.W.3d 268, 287 (Tenn. 2014). However, if a trial court substantially complies with the rule's requirements, the court's ruling will not be overturned absent an abuse of discretion. Id. (citing State v. Kiser, 284 S.W.3d 227, 288-89 (Tenn. 2009); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)). This court will find an abuse of discretion "only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008) (citing Konvalinka v. Chattanooga–Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

In Logan's case, a jury-out hearing regarding the admissibility of the Mississippi evidence was held partway through Sergeant Chestnut's testimony at trial. During this Rule 404(b) hearing, Sergeant Flowers, Sergeant Jones, Margaret Davis, Ashley Bowlin, and Detective Tarkington testified, providing substantially the same testimony that they later provided at trial. At the conclusion of this testimony, the State argued that this evidence was admissible because it was probative of whether Logan shared motive, intent, and guilty knowledge with Jackson at the time that Jackson shot Sergeant Chestnut. It noted that Logan rented a car in Louisville, purchased clothing for Jackson, and drove to Greenwood, Mississippi. After entering the optometrist's office in Greenwood, Logan threatened to kill several people, placed his gun to people's heads, and stole a correctional officer's revolver before helping Jackson escape from custody. Jackson later used the stolen revolver to shoot Sergeant Chestnut four times. The State asserted that the video recording of the stop, which the jury had not yet seen, showed Logan smiling at Sergeant Chestnut after the shooting occurred. It argued that Jackson's act of shooting Sergeant Chestnut in Tennessee was merely a continuation of the crimes committed by Logan in Mississippi. It also asserted that Jackson and Logan were

-11-

working together at the time of the offenses in Tennessee to ensure that they both avoided apprehension.

Defense counsel responded that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. He noted that half of the witnesses who testified during the Rule 404(b) hearing cried during their testimony, which was extremely prejudicial to Logan's case. Defense counsel argued that although the State claimed Logan and Jackson shared the same intent, Sergeant Chestnut's testimony established that Logan complied with his requests and stayed in the area in which he was directed to stand until Jackson fired the shots. Finally, defense counsel argued that while the State would not be hampered in presenting its case if the Mississippi evidence was not admitted, Logan would be substantially prejudiced if the evidence regarding these unrelated crimes, wrongs, or acts in Mississippi was admitted.

At the conclusion of the hearing, the trial court took the matter under advisement because it had not heard all the proof from Sergeant Chestnut and other witnesses that could affect the admissibility of the Rule 404(b) evidence. After hearing the rest of Sergeant Chestnut's testimony at trial, as well as the testimony from several other Tennessee officers, the court made the following ruling, outside the presence of the jury, regarding the admissibility of the Rule 404(b) evidence: "The Court is of the opinion that the probative value of the proof outweighs the prejudicial value towards motive and intent in this matter so [t]he Court will allow that."

First, Logan contends that the trial court should have excluded the evidence regarding his acts in Mississippi because the probative value of the testimony was "substantially outweighed" by the danger of unfair prejudice under Rule 403. He claims that this proof, which highlighted his violent behavior and his use of a weapon in Mississippi, had "an extremely prejudicial and detrimental effect not merely on his efforts to defend himself, but more centrally on his ability to receive a fair trial." Although Logan argues that the trial court should have excluded this evidence under Rule 403, we conclude that the trial court properly applied the more stringent standard of Rule 404(b) because the evidence at issue reflected upon Logan's character. State v. James, 81 S.W.3d 751, 758 (Tenn. 2002) (citing DuBose, 953 S.W.2d at 655); see also W. Mark Ward, Tennessee Criminal Trial Practice, Evidence—Proof of other crimes by defendant, § 22:24 (noting that the standard in Rule 404(b) is "weighted more toward exclusion than Rule 403").

Second, Logan argues that even if Rule 404(b) is the appropriate standard, the trial court failed to fully comply with the procedure outlined in that rule. He claims the trial court failed to determine that a material issue existed other than conduct conforming with

a character trait and failed to state on the record the material issue, the ruling, and the reasons for admitting the evidence. Logan claims that the trial court's sparse ruling failed to explain how testimony from the Mississippi witnesses established his motive or intent to commit the Tennessee offenses or how the probative value of this evidence outweighed the danger of unfair prejudice to him.

Despite Logan's arguments to the contrary, the record shows that the trial court substantially complied with Rule 404(b)'s procedural requirements. The trial court conducted a hearing regarding the admissibility of this evidence outside the presence of the jury. Although the record shows that defense counsel did not specifically ask the court to state the material issue, the ruling, and the reasons for admitting the evidence, the court did all of these things. The court determined that a material issue existed other than conduct conforming with a character trait, namely that the evidence regarding Logan's role in the Mississippi offenses established his motive and intent to commit the crimes in Tennessee. Although the court did not find proof of the other crimes, wrongs, or acts in Mississippi to be clear and convincing, this requirement is met because the testimony from multiple eyewitnesses overwhelmingly identified Logan as the individual who committed these acts in Mississippi, and Logan never challenged these identifications. See Clark, 452 S.W.3d at 291 (holding that although the trial court did not expressly state that the evidence of the defendant's pornography use was "clear and convincing," this procedural requirement was met because the defendant admitted using pornography throughout the investigation and trial); State v. Ray Anthony Nelson, No. 03C01-9706-CR-00197, 1998 WL 694971, at *8-9 (Tenn. Crim. App., Knoxville, Sept. 9, 1998) (stating that the trial court substantially complied with Rule 404(b) when it met all the requirements of the rule except the need to make a clear and convincing evidence determination and the record established that there was "no real question" that the alleged events occurred); see also State v. Jones, 450 S.W.3d 866, 892 (Tenn. 2014) (The clear and convincing evidence standard mandates that there be no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.). The trial court also held that it was admitting the evidence from the Mississippi witnesses because the probative value of this proof was not outweighed by the danger of unfair prejudice. Accordingly, we conclude that the trial court substantially complied with the procedure in Rule 404(b).

Third, Logan argues that evidence regarding his Mississippi crimes does not create the requisite intent to commit further offenses to avoid detection or capture. See W. Mark Ward, Tennessee Criminal Trial Practice § 22:24 (2014-2015 ed.) ("[T]he 'intent' exception [to Rule 404(b)] should not allow the introduction of other crimes simply to allow the state to prove the applicable mens rea."); State v. Benjamin Gunn, No. W2013-02006-CCA-R3-CD, 2015 WL 847431, at *4 (Tenn. Crim. App. Jan. 30, 2015) ("'The

conclusion that a defendant had the specific intent to commit the crime charged on a specific day and time because he or she committed a similar crime on another day and time requires an inference that the defendant has the propensity to commit the crime on trial which is precisely what is condemned by the Rule.'" (quoting W. Mark Ward, Tennessee Criminal Trial Practice § 22:24 (2014-2015 ed.)). Logan asserts that his involvement in Jackson's escape from custody in Mississippi "cannot be used to infer that he then had the intent to assist in the shooting of Sergeant Chestnut" in Tennessee.

Here, the trial court found the material issues that existed, other than conduct conforming to a character trait, were Logan's intent and motive to commit the crimes in Tennessee. At trial, the State argued that Logan was criminally responsible for the offenses of attempted first degree murder and employment of a firearm during flight or escape. Consequently, the State was required to prove that Logan had the intent required for criminal responsibility. An individual is criminally responsible for the conduct of another person if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" T.C.A. § 39-11-402(2). Therefore, criminal responsibility for the actions of another person "requires that a defendant act with a culpable mental state, specifically, the 'intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense.'" State v. Carson, 950 S.W.2d 951, 954 (Tenn. 1997) (quoting T.C.A. § 39-11-402(2)). "A person acts with intent as to the nature or result of conduct when it is that person's conscious objective or desire to engage in the conduct or cause the result." Id. (citing T.C.A. § 39-11-302(a); State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)). While we agree that a prior unconnected crime would likely prove nothing more than Logan's propensity to commit the charged crimes, the record shows the Mississippi crimes precipitated the Tennessee crimes. See W. Mark Ward, Tennessee Criminal Trial Practice § 22:24 (2014-2015 ed.) ("[W]hen the state proposes to offer proof of prior crimes to show intent, . . . the state should be able to demonstrate that the prior crime is "connected" to the present crime in some unique way such that it has probative value on the issue of intent apart from any inference that defendant simply has the propensity to commit that type of offense."). Logan facilitated Jackson's escape, stole the revolver that Jackson later used to shoot Sergeant Chestnut, and drove Jackson away from the scene of the shooting. At the time that Logan committed these acts, he and Jackson shared the common goal of avoiding apprehension in Tennessee. Based on the evidence presented at trial, a rational jury could have found that Logan, acting with the intent to assist Jackson in the commission of the offenses or acting with the intent to benefit in the results of the offenses, aided Jackson in committing the charged offenses in Tennessee.

We also agree with the trial court that the Mississippi crimes established Logan's motive to commit the crimes in Tennessee. "Motive is a relevant circumstantial fact that refers to why a defendant did what he did." State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005). Proof of motive "is often pertinent as the basis to infer that the act was committed, to prove requisite mental state, or to prove the identity of the actor." Id. (citation omitted). During cross-examination of the State's witnesses, the defense intimated that Logan had complied with Sergeant Chestnut's requests and had played no role in Sergeant Chestnut's shooting, which placed Logan's motive and intent at issue. Based on the aforementioned analysis, we conclude the evidence of the Mississippi crimes established Logan's motive to aid Jackson in committing the charged offenses in Tennessee to avoid apprehension. See id. Moreover, the admission of the Rule 404(b) evidence was necessary because the remaining evidence at trial did not conclusively establish Logan's motive and intent to commit the offenses in Tennessee. Jones, 450 S.W.3d at 892 (citing White v. State, 533 S.W.2d 735, 739 (Tenn. Crim. App. 1975)).

To buttress his argument as to the inadmissibility of this evidence, Logan also claims that this evidence failed to demonstrate a common scheme or plan between the escape in Mississippi and the shooting of Sergeant Chestnut in Tennessee. We disagree. The Mississippi crimes were a part of the same transaction and were so logically connected to the offenses in Tennessee that the proof of the Mississippi crimes tended to prove the crimes in Tennessee and/or was necessary to prove the crimes in Tennessee. See T.P.I.—Crim. 42.10 Evidence of other crimes; see also Carroll v. State, 370 S.W.2d 523, 529 (Tenn. 1963) ("'[Evidence of other crimes] is also admissible, where the crime charged is a part of a plan or system of criminal action, to offer evidence of other crimes near to it in time and of similar character, to show the knowledge and intent of the accused, and that the crime with which he is charged was not the result of accident or inadvertence.'" (quoting Mays v. State, 238 S.W. 1096, 1103 (Tenn. 1921))); Simmons v. State, 483 S.W.2d 590, 594 (Tenn. Crim. App. 1972) ("'Evidence of another offense is also relevant and admissible where the two crimes are logically related or connected, so that proof of the other tends, or is necessary, to prove the one charged, or is necessary to a complete account thereof, as where they are so inseparable as to constitute but one transaction or crime, or where the extraneous crime forms part of a chain of circumstantial evidence of guilt of the crime charged.'" (quoting Vol. 22A C.J.S. Criminal Law § 683)). The offenses in Mississippi and Tennessee occurred only five hours apart and took place in adjoining states. Other than the time it took Logan and Jackson to drive from Mississippi to Tennessee, there was no break between when the crimes occurred in Mississippi and when the crimes occurred in Tennessee. As we noted, the Mississippi crimes created the need for Logan and Jackson to commit the Tennessee crimes to avoid apprehension. Consequently, we conclude that the Mississippi evidence not only established Logan's intent and motive to commit the crimes in Tennessee but

-15-

also showed a common scheme or plan between the offenses in Mississippi and Tennessee.

Finally, Logan argues that the trial court erred in admitting the Mississippi evidence because the probative value of this proof was outweighed by the danger of unfair prejudice. He claims that the offenses in Mississippi were unrelated to the offenses in Tennessee because they were committed in separate states and were committed hours apart. He also asserts that while he was the primary actor in the escape in Mississippi, Jackson was the primary actor in the shooting of Sergeant Chestnut in Tennessee. In addition, Logan argues that the State never demonstrated how the evidence of the escape in Mississippi enlightened the jury as to his intent or motive to assist in the shooting of Sergeant Chestnut in Tennessee. In light of the prejudicial nature of this evidence, he claims the trial court should have ruled the evidence inadmissible or should have limited the witnesses' testimony to the fact that an escape occurred, rather than "permitting in depth and disturbing testimony" regarding his conduct during the escape.

Because the trial court substantially complied with the procedural requirements of Rule 404(b), we must review the trial court's decision to admit this evidence for an abuse of discretion. The balancing test in Rule 404(b)(4) requires that evidence of another crime, wrong, or act be excluded if the probative value of the evidence is outweighed by the danger of unfair prejudice. "Unfair prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" DuBose, 953 S.W.2d at 654 (quoting State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978)). The trial court is required to weigh the concerns of unfair prejudice against the probative value of the evidence in issue, which necessarily depends on the need for the evidence in light of the issues at trial and the other proof available to the State. Jones, 450 S.W.3d at 894-95 (citing State v. Burchfield, 664 S.W.2d 284, 287 (Tenn. 1984)). The evidence regarding the Mississippi crimes had significant probative value because it established Logan's intent and motive to commit the crimes in Tennessee under a theory of criminal responsibility and established a common scheme or plan. This evidence established that Logan helped Jackson escape from custody in Mississippi, that the revolver Logan stole from Sergeant Flowers in Mississippi was used by Jackson to shoot Sergeant Chestnut in Tennessee, and that both Logan and Jackson had an interest in avoiding capture based on the events that occurred in Mississippi. Although the evidence of Logan's involvement in the Mississippi crimes was prejudicial, admission of this proof was necessary in order for the jury to determine whether Logan had the intent required for criminal responsibility. For these reasons, we conclude that the trial court did not abuse its discretion in admitting the Mississippi evidence after

-16-

determining that the probative value of this evidence was not outweighed by the danger of unfair prejudice.

**II. Sufficiency of the Evidence.** Logan argues that the evidence presented at trial is insufficient to sustain his convictions for attempted first degree premeditated murder and employment of a firearm during the flight or escape from the attempt to commit a dangerous felony. He claims the State failed to establish that he was criminally responsible for Jackson's conduct beyond a reasonable doubt, asserting there was no evidence that he associated himself with the venture, acted with knowledge that the offense was to be committed, or shared in the criminal intent to commit the shooting of Sergeant Chestnut. We conclude that the evidence is sufficient to support his convictions.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent

with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Id.

Pursuant to State v. Dickson, 413 S.W.3d 735, 744 (Tenn. 2013), we must consider the following issues in determining whether the evidence is sufficient to sustain Logan's conviction for attempted first degree premeditated murder: (1) whether Logan was criminally responsible for the acts of Jackson because Logan promoted or assisted in the commission of the offense, or benefitted in the proceeds or results of the offense pursuant to Tennessee Code Annotated section 39-11-402(2); (2) whether Jackson intended to kill Sergeant Chestnut and took a "substantial step" toward the offense for the purposes of the criminal attempt statute in Tennessee Code Annotated section 39-12-101(a)(3); and (3) whether Jackson acted with sufficient premeditation in his attempt to kill Sergeant Chestnut within the meaning of Tennessee Code Annotated section 39-13-202(a)(1). Because our analysis of issue (1) is the most involved, we will consider issues (2) and (3) before considering whether Logan was criminally responsible for Jackson's conduct in shooting Sergeant Chestnut.

First, we will first consider whether Jackson intended to kill Sergeant Chestnut and whether he took a "substantial step" toward the commission of this offense pursuant to the criminal attempt statute. As relevant in this case, a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense, "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3); see Dickson, 413 S.W.3d at 745. "Conduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." T.C.A. § 39-12-101(b). "[T]he question of whether a defendant has taken a substantial step toward the commission of a crime sufficient to support a conviction for criminal attempt is necessarily a heavily fact-intensive inquiry determined by the specific circumstances shown in each individual case[.]" Davis, 354 S.W.3d at 733.

The evidence shows that Jackson acted with the intent to complete a course of action that would constitute the criminal offense. During the traffic stop, Jackson obtained the loaded revolver that Logan had stolen from the correctional officer in Mississippi. He exited the rental car, walked over to the patrol car, and made a short statement to Sergeant Chestnut before shooting him four times at close range. The evidence also establishes that Jackson took a "substantial step" toward the commission of

-18-

attempted first degree murder. A jury may determine that an actor has taken a "substantial step" toward committing a crime if the actor possesses materials to be used in the commission of the crime at the scene of the crime:

> "[W]hen an actor possesses materials to be used in the commission of a crime, at or near the scene of the crime, and where the possession of those materials can serve no lawful purpose of the actor under the circumstances, the jury is entitled, but not required, to find that the actor has taken a 'substantial step' toward the commission of the crime if such action is strongly corroborative of the actor's overall criminal purpose."

Dickson, 413 S.W.3d at 745 (quoting State v. Reeves, 916 S.W.2d 909, 914 (Tenn. 1996)). The evidence shows that Jackson obtained the stolen revolver for the purpose of shooting Sergeant Chestnut to avoid apprehension. Jackson's conduct in carrying the loaded revolver and firing it several times at the officer was corroborative of his intent to kill Sergeant Chestnut. Consequently, a rational jury could have found, based on the circumstantial evidence presented, that Jackson took a "substantial step" toward committing the crime of attempted first degree murder.

Next, we must consider whether there is sufficient evidence that Jackson acted with premeditation in firing upon Sergeant Chestnut. Because Jackson was the shooter in this case, we must consider Jackson's conduct in determining whether there is sufficient proof of premeditation to support Logan's conviction for attempted first degree premeditated murder. See id. at 746 (citing Howard, 30 S.W.3d at 275-77 (noting that because the defendant was not accused of firing the gun that killed the victim, the State was required to prove that the defendant was criminally responsible for the premeditated murder based upon the shooter's conduct)).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.  The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense.  State v. Young, 196 S.W.3d 85, 108 (Tenn. 2006) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)); State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000).  Factors that may support the existence of premeditation include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, calmness immediately after the killing, and destruction and secretion of evidence of the killing.  Kiser, 284 S.W.3d at 268; State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003); Bland, 958 S.W.2d at 660.  In addition, a jury may infer premeditation from any planning activity by the defendant before the killing, from evidence concerning the defendant's motive, and from proof regarding the nature of the killing.  Bordis, 905 S.W.2d at 222 (citation omitted).

At the time of the traffic stop, Jackson had just escaped from custody in Mississippi and did not wish to be apprehended.  Because Jackson obtained a loaded handgun and placed it on his person prior to the shooting, a rational jury could have found that Jackson planned to use the weapon against the officer.  After shooting Sergeant Chestnut several times and inflicting multiple injuries, Jackson appeared calm in the video before fleeing to avoid arrest.  All of these circumstances support a finding of premeditation.  Accordingly, there was sufficient proof that Jackson acted with premeditation when he fired the shots at Sergeant Chestnut.

Finally, we must consider whether Logan was criminally responsible for the offenses committed by Jackson.  In other words, we must determine whether "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [Logan] solicit[ed], direct[ed], aid[ed], or attempt[ed] to aid [Jackson] to commit the offense[.]"  T.C.A. § 39-11-402(2).  We note that criminal responsibility is not a distinct crime but "a theory by which the state may prove the defendant's guilt based on another person's conduct."  State v. Osborne, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing State v. Mickens, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)).  "[D]efendants convicted under a theory of criminal responsibility are considered to be principal offenders, just as if they had committed the crime themselves."  State v. Sherman, 266 S.W.3d 395, 408 (Tenn. 2008) (citing Carson, 950 S.W.2d at 954).  Under the theory of criminal responsibility, "an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime can be inferred."  State v. Watson, 227 S.W.3d 622, 639 (Tenn. Crim. App. 2006) (citing State v. Ball, 973 S.W.2d

-20-

288, 293 (Tenn. Crim. App. 1998)). In this situation, "[n]o particular act need be shown, and the defendant need not have taken a physical part in the crime to be held criminally responsible." Id. (citing Ball, 973 S.W.2d at 293)). Nevertheless, in order to be convicted under a theory of criminal responsibility, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." Dorantes, 331 S.W.3d at 386 (citing Maxey, 898 S.W.2d at 757; State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

The circumstantial evidence presented at trial was substantial, and a reasonable jury could have found that Logan, acting with the intent to assist in the commission of the offense or acting with the intent to benefit in the results of the offense, aided Jackson in committing the offense of attempted first degree premeditated murder. As we previously noted, physical participation is not required under the theory of criminal responsibility. Logan helped Jackson escape, stole the revolver that Jackson used to shoot Sergeant Chestnut, and then drove them away from the scene following the shooting. Logan benefitted from Jackson shooting Sergeant Chestnut because it enabled them both to avoid immediate apprehension. The State presented sufficient evidence for a rational jury to have found that Logan was criminally responsible for Jackson's conduct in shooting Sergeant Chestnut.

We also conclude that the evidence is sufficient to sustain Logan's conviction for employing a firearm during the flight or escape from the attempt to commit a dangerous felony. For this count, the State was required to prove beyond a reasonable doubt that Logan, either as a principal or under the theory of criminal responsibility, "employ[ed] a firearm during the . . . flight or escape from the attempt to commit a dangerous felony." T.C.A. § 39-17-1324(b)(4). A dangerous felony is defined as "[a]ttempt to commit first degree murder as defined in §§ 39-12-101 and 39-13-202[.]" Id. § 39-17-1324(i)(1)(A). Viewing the evidence in the light most favorable to the State, a rational jury could have determined that Logan employed his own firearm, the FEG semi-automatic pistol that he used in Greenwood and that was found on top of the center console of the rental car, during the flight or escape from the attempted first degree murder offense. Moreover, incorporating the analysis in the previous paragraph, a rational jury could have found that Logan was criminally responsible for Jackson's employment of the revolver during the flight or escape from the attempted first degree murder offense. Consequently, the evidence is sufficient to sustain this conviction as well.

Alternatively, we conclude that the crimes in Tennessee were a natural and probable consequence of the crimes committed by Logan in Mississippi. The natural and probable consequences rule "extends the scope of criminal liability to the target crime intended by a defendant as well as to other crimes committed by a confederate that were

-21-

the natural and probable consequences of the commission of the original crime." Howard, 30 S.W.3d at 276 (citing Carson, 950 S.W.2d at 954-55). Although the natural and probable consequences rule is not explicitly included in the code, it nevertheless "survived the common law into the criminal responsibility statutes[.]" Id. (citing Carson, 950 S.W.2d at 954-55). This rule "underlies the doctrine of criminal responsibility and is based on the recognition that aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put into motion." Id. (citing Carson, 950 S.W.2d at 954-55; Key v. State, 563 S.W.2d 184, 186 (Tenn. 1978); State v. Grooms, 653 S.W.2d 271, 275 (Tenn. Crim. App. 1983)). The Tennessee Supreme Court established a three-part test that must be satisfied before imposing liability under the natural and probable consequences rule:

> [T]o impose criminal liability based on the natural and probable consequences rule, the State must prove beyond a reasonable doubt and the jury must find the following: (1) the elements of the crime or crimes that accompanied the target crime; (2) that the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime.

Id. The natural and probable consequences rule "reinforces the principle that the jury, not the court, is vested with the power to weigh the sufficiency of evidence and determine whether collateral crimes, committed by relevant parties in both physical and spatial proximity of the target crime, are the natural and probable consequences of the intended criminal behavior." State v. Richmond, 90 S.W.3d 648, 656-57 (Tenn. 2002). "[T]he natural and probable consequence rule 'presupposes an outcome within a reasonably predictable range.'" Id. at 276 (quoting Carson, 950 S.W.2d at 955).

Here, the trial court properly instructed the jury on the natural and probable consequences rule. See T.P.I.—Crim. 3.01 Criminal responsibility for conduct of another (2015). Relying on our prior analysis, we conclude that the State established the aforementioned factors beyond a reasonable doubt. We also conclude that a reasonable jury could have found that the attempted first degree murder and employment of a firearm during flight or escape offenses were the natural and probable consequences of the crimes committed by Logan in Mississippi. Therefore, the evidence is sufficient to sustain Logan's convictions on this basis as well.

**III. Excessive Sentence.** Finally, Logan contends that he received an excessive sentence. He claims the trial court erred by "enhancing his sentence within the range" and by "making the sentences consecutive to one another," though he concedes that the

-22-

sentence for the firearm offense is statutorily required to be served consecutively to the underlying offense. We conclude that while the trial court properly sentenced Logan for his conviction for attempted first degree premeditated murder, it made a few errors in the judgment form regarding his conviction for employment of a firearm during flight or escape.

The 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. Pursuant to Bise, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1)    The evidence, if any, received at the trial and the sentencing hearing;
(2)    The presentence report;
(3)    The principles of sentencing and arguments as to sentencing alternatives;
(4)    The nature and characteristics of the criminal conduct involved;
(5)    Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6)    Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7)    Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Comments. In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102(3)(C), -103(5). In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

-23-

At the sentencing hearing, the State entered Logan's presentence report and Sergeant Chestnut's victim impact statement into evidence. Although no testimony was presented, the court heard arguments from counsel regarding Logan's sentence. The court properly determined that Logan was a Range I, standard offender, which meant that he faced a sentence of fifteen to twenty-five years for his conviction for attempted first degree murder, a Class A felony. Id. §§ 39-12-107(a); 39-13-202(a)(1); 40-35-105; 40-35-112(a)(1). However, the record shows the trial court was under the mistaken impression that Logan faced a sentence of three to six years for his conviction for the firearm offense because it was classified as a Class C felony.

The trial court applied enhancement factor (1), that Logan had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. Id. § 40-35-114(1). The court applied this factor to both convictions based on Logan's prior convictions for robbery, assault, evading arrest, unauthorized use of an automobile, and violation of the driver's license law.

The court also applied enhancement factor (2), that Logan was a leader in the commission of an offense involving two (2) or more criminal actors. Id. § 40-35-114(2). The trial court applied this factor to both convictions because Logan was "the person who took the car to Mississippi, who set up all of this, and was at the doctor's office and then came in the place with the firearm and instigated all of this." When defense counsel argued that the offenses in this case concerned the shooting of Sergeant Chestnut in Nashville, the court responded, "Well, I understand that but it had to start somewhere."

Finally, the court applied enhancement factor (6), that the personal injuries inflicted upon the victim were particularly great, to both convictions. Id. § 40-35-114(6). At trial, Sergeant Chestnut testified that he had been shot four times and that his permanent injuries made him unable to remain employed as a full-time police officer.

After applying these enhancement factors, the trial court sentenced Logan as a Range I, standard offender to twenty-five years for the attempted first degree premeditated murder conviction and to six years for the employment of a firearm during the flight or escape from the attempt to commit a dangerous felony conviction. The court noted that these sentences were statutorily required to be served consecutively, for an effective sentence of thirty-one years. See id. § 39-17-1324(e)(1).

On appeal, Logan does not challenge the trial court's application of enhancement factors (1) and (6) but asserts that enhancement factor (2) was improperly applied. He claims the court erroneously considered Logan's role in the events in Mississippi before

determining that he was a leader in the commission of the offenses in Tennessee. Enhancement factor (2) "does not require that the defendant be the sole leader but rather that he be 'a leader,' and as a result both of two criminal actors may qualify for enhancement under this factor." State v. Freeman, 943 S.W.2d 25, 30 (Tenn. Crim. App. 1996) (citing State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993)). This means that "it is possible for multiple people to lead during part or all of the offense." State v. Willie Duncan, No. W2013-02554-CCA-R3-CD, 2014 WL 4243746, at *16 (Tenn. Crim. App. Aug. 27, 2014), perm. app. granted (Tenn. Feb. 13, 2015). The facts show that Logan led the preparation for these offenses and Jackson led the perpetration of these offenses by firing the shots at Sergeant Chestnut; nevertheless, both were leaders of the charged offenses in Tennessee. See Hicks, 868 S.W.2d at 731. Although Jackson fired the shots at the officer, Logan took a leadership role in the charged offenses by helping Jackson escape from custody and by providing him with the stolen revolver used to shoot Sergeant Chestnut. Consequently, we conclude that the trial court properly applied enhancement factor (2).

Logan also argues that the trial court did not sufficiently consider the sentencing considerations in Tennessee Code Annotated section 40-35-102 and -103 prior to sentencing him. He claims that the court did not sentence him to "the least severe measure necessary to achieve the purposes for which the sentence is imposed" and did not consider his potential for rehabilitation prior to sentencing him to the maximum sentence in the range. Regarding the attempted first degree murder conviction, the record shows the trial court sentenced Logan to the highest sentence in the applicable range after considering the severity of the offenses committed against Sergeant Chestnut and after properly applying three enhancement factors. We conclude that the trial court did not abuse its discretion in imposing a sentence of twenty-five years for this conviction. However, as we will explain, we detect a few errors in the judgment form for Logan's employment of a firearm during escape or flight conviction, which necessitates entry of a corrected judgment.

The record shows that the trial court was under the mistaken impression that Logan, as a Range I, standard offender, faced a sentence of three to six years for the employment of a firearm during flight or escape conviction because this offense is classified as a Class C felony. See T.C.A. § 40-35-112(a)(3) (a Range I sentence for a Class C felony is three to six years). However, Code section 39-17-1324 requires "a mandatory minimum six-year sentence" for this offense, unless "the defendant, at the time of the offense, had a prior felony conviction[,]" in which case, "a mandatory minimum ten-year sentence" is required. Id. § 39-17-1324(h)(1), (2). The presentence report shows that Logan had a prior felony conviction for robbery at the time of the offenses in this case; however, the trial transcript, jury charge, and verdict form do not

indicate that the State sought to have Logan's sentence enhanced pursuant to Code section 39-17-1324(h)(2). See id. § 39-17-1324(f) ("In a trial for a violation of subsection (a) or (b), where the state is also seeking to have the person sentenced under subdivision (g)(2) or (h)(2), the trier of fact shall first determine whether the person possessed or employed a firearm" and "[i]f the trier of fact finds in the affirmative, proof of a qualifying prior felony conviction pursuant to this section shall then be presented to the trier of fact."). Therefore, although the trial court was mistaken as to the sentencing range of three to six years for this conviction, its imposition of a six-year sentence with a release eligibility of one hundred percent was proper. See id. § 40-35-501(j) (stating that "[t]here shall be no release eligibility for a person committing a violation of § 39-17-1324(a) or (b) on or after January 1, 2008, until the person has served one hundred percent (100%) of the minimum mandatory sentence established in § 39-17-1324(a) or (b)"). On the judgment form, the court imposed a sentence length of six years and properly checked the box under "Mandatory Minimum Sentence Length" for "39-17-1324 Possession/Employment of Firearm." Under the offender status section, the trial court checked the box for "Standard," and under the release eligibility section, it checked the box for "Violent 100%." Although the release eligibility section of the particular uniform judgment form used in this case provided several options by which a trial court could specify a release eligibility of "100%" for certain types of offenses, a violation of Code section 39-17-1324 was not given as an option. Because the offense of employment of a firearm during the flight or escape from the attempt to commit a dangerous felony is not one of the violent offenses specified in Code section 40-35-501(i)(2), we remand this case for entry of a corrected judgment. Upon remand, the trial court has the option of either redacting the word "Violent" and leaving the 100% release eligibility designation or using the "Special Conditions" section of the judgment form to specify that Logan received a sentence of six years at one hundred percent release eligibility for his conviction under Code section 39-17-1324(b)(4). See State v. Marquize Berry, No. W2014-00785-CCA-R3-CD, 2015 WL 1278415, at *4-6 (Tenn. Crim. App. Mar. 18, 2015) (Witt, J., majority opinion) (Page, J., dissenting); State v. Derek Horne, No. W2014-00333-CCA-R3-CD, 2015 WL 154539, at *4 (Tenn. Crim. App. Jan. 13, 2015).

We note another error in this judgment form. Logan was charged with attempted first degree premeditated murder in count 1 and employment of a firearm during the flight or escape from the attempt to commit a dangerous felony in count 3. Although Logan was not charged in count 2 of the indictment, Jackson was charged in count 2 with employing a firearm during the attempt to commit a dangerous felony. The preliminary jury instructions correctly state that Logan was charged with "one count of Employing a Firearm During Flight or Escape from the commission of or attempt to commit a dangerous offense" and the verdict form shows that the jury found Logan guilty of

-26-

"Employing a Firearm During Escape."  However, the judgment form erroneously shows that in count "2" Logan was found guilty of "employing firearm during dangerous felony," which is a different offense than the one for which Logan was charged in count 3 of the indictment.  Compare T.C.A. §§ 39-17-1324(b)(1), (2), with T.C.A. §§ 39-17-1324(b)(3), (4).  Therefore, we also remand for entry of a corrected judgment showing that Logan was found guilty in count 3 of employment of a firearm during the flight or escape from the attempt to commit a dangerous felony.

## CONCLUSION

Based on the aforementioned authorities and reasoning, we affirm Logan's convictions but remand the case to the trial court for entry of a corrected judgment showing a conviction for employment of a firearm during the flight or escape from the attempt to commit a dangerous felony in count 3 and either redacting the word "Violent" and leaving the 100% release eligibility designation or using the "Special Conditions" section of the judgment form to specify that Logan received a sentence of six years at one hundred percent release eligibility for his conviction under Code section 39-17-1324(b)(4).  The judgments of the trial court are affirmed in all other respects.

_____
CAMILLE R. McMULLEN, JUDGE